1    COOLEY LLP
     MICHAEL G. RHODES (116127)
2    (rhodesmg@cooley.com)
     101 California Street. 5th Floor
3    San Francisco, CA  94111-5800
     Telephone:     (415) 693-2000
4    Facsimile:     (415) 693-2222

5    PHILLIP E. MORTON (*pro hac vice*)
     (pmorton@cooley.com)
6    Reston Town Center, 11951
7    Freedom Drive
     Reston, VA 20190-5656
8    Telephone: (703) 456-8000

     HEIDI L. KEEFE (178960)
     (hkeefe@cooley.com)
     MARK R. WEINSTEIN (193043)
     (mweinstein@cooley.com)
     ANDREW C. MACE (284484)
     (amace@cooley.com)
     3175 Hanover Street
     Palo Alto, CA  94304-1130
     Telephone:     (650) 843-5000
     Facsimile:     (650) 849-7400

9    Attorneys for Defendant
     ServiceNow, Inc.
10

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13

14

15   HEWLETT-PACKARD COMPANY, a
     Delaware Corporation,

16                                              Case No.   14-cv-00570-BLF
                    Plaintiff,
                                                **DEFENDANT SERVICENOW, INC.'S**
17          v.                                  **NOTICE OF MOTION AND MOTION FOR**
                                                **SUMMARY JUDGMENT OF INVALIDITY**
18                                              **UNDER 35 U.S.C. SECTION 101**
     SERVICENOW, INC., a Delaware
19   Corporation,                               DATE:    January 29, 2015
                                                TIME:    9:00 a.m.
20                  Defendant.                  CTRM:    3
                                                JUDGE:   Beth Labson Freeman
21

22

23

24

25

26

27

28

1

TABLE OF CONTENTS

2

PAGE

3     NOTICE OF MOTION AND MOTION ........................................................................ 1

4     MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 1

      I.      INTRODUCTION ............................................................................................ 1

5     II.     ALICE CONFIRMED THE UNPATENTABILITY OF ABSTRACT IDEAS
6             IMPLEMENTED ON A COMPUTER .............................................................. 2

7     III.    THE SUBJECT PATENTS ARE INVALID FOR FAILING TO CLAIM
              PATENTABLE SUBJECT MATTER ............................................................... 3

8             A.      Alice Step 1 - The Asserted Claims are Directed to Abstract Ideas ...................... 3

9                     1.      The '683 Patent Claims the Unpatentable Abstract Idea of
                              Monitoring Deadlines ................................................................. 6

10                    2.      The '802 Patent Claims the Unpatentable Abstract Idea of Writing
                              Instructions .............................................................................. 11

11                    3.      The '512 Patent Claims the Unpatentable Abstract Idea of
                              Following Instructions .............................................................. 13

12
                      4.      The '229 Patent Claims the Unpatentable Abstract Idea of
13                            Organizing Information in a Hierarchy for Later Access ........................ 16

14            B.      Alice Step 2 - The Asserted Claims Do Not Contain Anything that
                      Transforms the Patent-Ineligible Abstract Ideas into Patent-Eligible
                      Inventions ................................................................................................ 20

15    IV.     CONCLUSION ............................................................................................. 23

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**

**PAGE(S)**

**Cases**

*Accenture Global Servs. v. Guidewire Software, Inc.,*
   728 F.3d 1336 (Fed. Cir. 2013)...................................................................................... 5

*Alice Corp. Pty. Ltd., v. CLS Bank Int'l.,*
   134 S. Ct. 2347 (2014) ...................................................................................... *passim*

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.,*
   133 S. Ct. 2107 (2013) .............................................................................................. 2

*Bancorp Servs. LLC v. Sun Life Assur. Co. of Canada,*
   687 F.3d 1266 (Fed. Cir. 2012).......................................................... 7, 12, 13, 14

*Bilski v. Kappos,*
   561 U.S. 593 (2010) ...................................................................................... *passim*

*buySAFE, Inc. v. Google, Inc.,*
   765 F.3d 1350 (Fed. Cir. 2014)................................................................................ 4

*BuySAFE, Inc. v. Google, Inc.,*
   964 F. Supp. 2d 331 (D. Del. 2013) ..................................................... 9, 12, 13, 14

*Cogent Medicine, Inc. v. Elsevier, Inc.,*
   Case Nos. C-13- 4479-RMW, C-13-4483, C-13-4486, 2014 WL 4966326
   (N.D. Cal. Sept. 30, 2014)............................................................................ 4, 18, 19

*Comcast IP Holdings I, LLC v. Sprint Commc'ns Co. L.P.,*
   No. 12-205-RGA, 2014 WL 3542055 (D. Del. July 16, 2014) ............................... 5

*Cyberfone Sys., Inc. v. CNN Interactive Grp., Inc.,*
   558 F. App'x 988 (Fed. Cir. 2014) ....................................................................... 16

*CyberSource Corp. v. Retail Decisions, Inc.,*
   654 F.3d 1366 (Fed. Cir. 2011)..................................................................... *passim*

*DDR Holdings, LLC v. Hotels.com, L.P.,*
   No. 2013-1505, 2014 WL 6845152 (Fed. Cir. Dec. 5, 2014) ............................... 23

*DietGoal Innovations LLC v. Bravo Media LLC,*
   No. 13 Civ 8391 (PAE), 2014 WL 3582914 (S.D.N.Y. July 8, 2014) ................... 5

*Digital-Vending Servs. v. Univ. of Phoenix,*
   672 F.3d 1270 (Fed. Cir. 2012)...................................................................... 10, 13

**TABLE OF AUTHORITIES**
**CONTINUED**

PAGE(S)

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
    758 F.3d 1344 (Fed. Cir. 2014)........................................................................ 2, 4, 16

*Every Penny Counts, Inc. v. Wells Fargo Bank, N.A.*,
    No. 8:11-cv-2826-T-23TBM, 2014 U.S. Dist. LEXIS 127369
    (M.D. Fla. Sept. 11, 2014) ..................................................................................... 5

*Gottschalk v. Benson*,
    409 U.S. 63 (1972) ................................................................................................ 2

*I/P Engine, Inc. v. AOL Inc.*,
    576 F. App'x 982 (Fed. Cir. 2014) ........................................................................ 4

*IPLearn, LLC v. K12, Inc.*,
    No. 11-1026-RGA, 2014 U.S. Dist. LEXIS 173850 (D. Del. Dec. 17, 2014)....................... 23

*Joao Bock Transaction Sys., LLC v. Jack Henry & Assocs., Inc.*,
    No. 12-1138-SLR, 2014 U.S. Dist. LEXIS 172567 (D. Del. Dec. 15, 2014) ....................... 23

*Le Roy v. Tatham*,
    55 U.S. 156 (1852) ................................................................................................. 3

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    132 S. Ct. 1289 (2012) .............................................................................. 3, 7, 21, 22

*Open Text S.A. v. Alfresco Software Ltd.*,
    No. 13-cv-04843-JD, 2014 WL 4684429 (N.D. Cal. Sept. 19, 2014) ..................... 4, 5, 21, 22

*Parker v. Flook*,
    437 U.S. 584 (1978) ............................................................................................... 2

*Planet Bingo, LLC v. VKGS LLC*,
    576 F. App'x 1005 (Fed. Cir. 2014) ....................................................................... 4

*In re Roslin Inst. (Edinburgh)*,
    750 F.3d 1333 (Fed. Cir. 2014) ............................................................................. 2

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014).........................................................................*passim*

*Walker Digital, LLC v. Google, Inc.*,
    No. 11-318-LPS, 2014 WL 4365245 (D. Del. Sept. 3, 2014).......................... 6, 8, 16

**Statutes**

35 U.S.C. § 101 ....................................................................................................*passim*

iii.

1

**TABLE OF AUTHORITIES**
**CONTINUED**

2

PAGE(S)

3

**Other Authorities**

4

Fed. R. Civ. P. 56 ......................................................................................................................... 2

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## NOTICE OF MOTION AND MOTION

2       PLEASE TAKE NOTICE that on January 29, 2015, at 9:00 a.m., in Courtroom 3, before

3    the Honorable Beth Labson Freeman, defendant ServiceNow, Inc. ("ServiceNow") will, and

4    hereby does, move for summary judgment of invalidity under 35 U.S.C. § 101.  The motion is

5    based on this Notice, the following Memorandum of Points and Authorities, the declaration of

6    Phillip E. Morton, and the proposed order submitted herewith, all papers and pleadings on file in

7    this action, such other evidence and argument as may be presented at or before any hearing on the

8    Motion, and all matters of which the Court may take judicial notice.

9       For the reasons set forth in the accompanying memorandum of point and authorities,

10   Defendant respectfully requests the Court grant Defendant's Motion for Summary Judgment of

11   Invalidity Under 35 U.S.C. § 101.

12

## MEMORANDUM OF POINTS AND AUTHORITIES

13   **I.    INTRODUCTION**

14       The asserted claims of U.S. Patent Nos. 8,224,683 (the "'683 Patent"), 7,890,802 (the

15   "'802 Patent") and 7,610,512 (the "'512 Patent") are all directed to various abstract ideas about

16   solving problems and managing solutions that have existed for decades both in and out of the

17   category of help desks (both on and off computers).[1]  The asserted claims of U.S. Patent No.

18   6,321,229 (the "'229 Patent")[2] are directed to the abstract organization of information into

19   categories and subcategories.  While at one time the Patent Office would routinely issue patents

20   like the '802, '512, '683 and '229 Patents (collectively, the "Subject Patents"), recent case law

21   has made it clear that merely implementing an old known process on a computer does not

22   transform abstract ideas into patent-eligible claims.  *See, e.g.*, *Alice Corp. Pty. Ltd., v. CLS Bank*

23   *Int'l.*, 134 S. Ct. 2347, 2358 (2014) ("[M]ere recitation of a generic computer cannot transform a

24   patent-ineligible abstract idea into a patent-eligible invention.").

25   _____

[1] The remaining patents in this case will be addressed at a later date.

26   [2] Citations to ('683 Patent, xx:yy-zz, '802 Patent, xx:yy-zz, '512 Patent, xx:yy-zz, and '229
     Patent, xx:yy-zz) refer to column and line numbers in the '683, '802, '512, and '229 Patents.  A

27   copy of the patents are attached to the Declaration of Phillip E. Morton in Support of Defendant
     ServiceNow's Motion for Summary Judgment of Invalidity Under 35 U.S.C. Section 101

28   ("Morton Decl.") as Exs. 1-4.

-1-                                   **DEFENDANT'S MOTION FOR SUMMARY**
                                        **JUDGMENT UNDER SECTION 101**
                                        **14-CV-00570-BLF**

Because the claimed subject matter of the asserted claims of the Subject Patents is not patent eligible under 35 U.S.C. § 101, the asserted claims are invalid as a matter of law.

## II. ALICE CONFIRMED THE UNPATENTABILITY OF ABSTRACT IDEAS IMPLEMENTED ON A COMPUTER

Rule 56 provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The validity of the asserted claims under 35 U.S.C. § 101, which defines patentable subject matter, is a "threshold" issue for the Court to decide as a matter of law. *Bilski v. Kappos*, 561 U.S. 593, 602 (2010); *see also*, *e.g.*, *In re Roslin Inst. (Edinburgh)*, 750 F.3d 1333, 1335 (Fed. Cir. 2014); *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1348 (Fed. Cir. 2014).

Patentable subject matter is defined by Section 101, which provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. While Section 101 is framed broadly, the Supreme Court has "long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice*, 134 S. Ct. at 2354 (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013)).

In cases like *Gottschalk v. Benson*, 409 U.S. 63 (1972), and *Parker v. Flook*, 437 U.S. 584 (1978), the Supreme Court constrained the scope of patentable subject matter for computer related inventions, finding unpatentable abstract ideas like computerized methods for converting binary-coded decimal numerals into pure binary numerals, *Gottschalk,* 409 U.S. at 72, and computerized methods for sounding an alarm when parameters of a catalytic conversion process exceeded limits established by a mathematical formula. *Parker,* 437 U.S. at 594-96. More recently, in *Bilski*, the Court affirmed the rejection of claims directed to "the basic concept of hedging," which "is a fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class." *Bilski,* 561 U.S. at 611.

1    In the Supreme Court's *Alice* decision, the Court's latest case on Section 101, the Court
2    rejected claims "drawn to the concept of intermediated settlement," which is also "long
3    prevalent" and is "a building block of the modern economy."   134 S. Ct. at 2356 (quoting *Bilski*,
4    561 U.S. at 611). The Court went on to confirm the two-step test that it discussed in *Mayo*[3] "for
5    distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those
6    that claim patent-eligible applications of those concepts."   *Alice*, 134 S. Ct. at 2355.  Step one of
7    the test requires the Court to "determine whether the claims at issue are directed to one of those
8    patent-ineligible concepts," such as an abstract idea.  *Id.*  Second, if the Court determines that the
9    claims are directed to a patent-ineligible concept, such as an abstract idea, then the Court must
10   "consider the elements of each claim both individually and as an ordered combination to
11   determine whether the additional elements transform the nature of the claim into a patent-eligible
12   application."  *Id.* (citation and quotation marks omitted).  The Supreme Court describes this
13   second step "as a search for an inventive concept—*i.e.*, an element or combination of elements
14   that is sufficient to ensure that the patent in practice amounts to significantly more than a patent
15   upon the ineligible concept itself."  *Id.* (quotation marks and brackets omitted).

16   Applying the *Alice* test here compels the conclusion that the asserted claims of the Subject
17   Patents are invalid under Section 101.

18   **III.    THE SUBJECT PATENTS ARE INVALID FOR FAILING TO CLAIM PATENTABLE SUBJECT
19   MATTER**

20   **A.    Alice Step 1 - The Asserted Claims are Directed to Abstract Ideas**

21   The first step of the *Alice* test asks "whether the claims at issue are directed to a patent-
22   ineligible concept," *i.e.*, whether they are directed to laws of nature, natural phenomena, or
23   abstract ideas. *Alice*, 134 S. Ct. at 2355.  Here, as in *Alice*, the patent-ineligible concepts at issue
24   are "abstract ideas."  *See id.*   While the law has long excluded abstract ideas from patent
25   protection, *see*, *e.g., Le Roy v. Tatham*, 55 U.S. 156, 174-75 (1852), the issue of abstract ideas has
26   become particularly acute as a result of the proliferation of patents involving previously known

27
28   _____
     [3] *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012).

**DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT UNDER SECTION 101
14-CV-00570-BLF**

1 processes now being performed by computers.

2       Relying on the Supreme Court's decisions in *Bilski* and *Alice*, the Federal Circuit and

3 district courts have found increasing numbers of computer-related patents unpatentable under

4 Section 101.   For example, relying on *Alice*, the Federal Circuit invalidated claims that "are

5 squarely about creating a contractual relationship—a 'transaction performance guaranty'—that is

6 beyond question of ancient lineage." *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1354  (Fed.

7 Cir. 2014).   In *Digitech*, the Federal Circuit affirmed the invalidity of "an ineligible abstract

8 process of gathering and combining data."  758 F.3d at 1351.  "Without additional limitations, a

9 process that employs mathematical algorithms to manipulate existing information to generate

10 additional information is not patent eligible."  *Id.*  And most recently in *Ultramercial*, the Federal

11 Circuit invalidated claims for a "method for distributing copyrighted media products over the

12 Internet where the consumer receives a copyrighted media product at no cost in exchange for

13 viewing an advertisement."  *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 712  (Fed. Cir. 2014).

14 Recent non-precedential opinions further illustrate the trend.  *See Planet Bingo, LLC v. VKGS*

15 *LLC*, 576 F. App'x 1005, 1007 (Fed. Cir. 2014) (affirming invalidity of claims directed to

16 computerized bingo game); *I/P Engine, Inc. v. AOL Inc.*, 576 F. App'x 982, 993-96 (Fed. Cir.

17 2014) (Mayer, J., concurring) (invalid claims directed to "system which filters information for

18 relevance to a user's query using combined content and collaborative data").

19       Likewise, district courts around the country have invalidated claims under Section 101

20 following the Supreme Court's guidance in *Alice*.  In *Cogent Medicine, Inc. v. Elsevier, Inc.*, Case

21 Nos. C-13- 4479-RMW, C-13-4483, C-13-4486, 2014 WL 4966326 (N.D. Cal. Sept. 30, 2014),

22 Judge Whyte invalidated a patent directed to the abstract idea of "maintaining and searching a

23 library of information" because the idea was "little different than the basic concept of organizing

24 a physical library so that an individual can search for information by going to the relevant portion

25 of the library and picking a book."  *Id.* at *4.  In *Open Text S.A. v. Alfresco Software Ltd.*, No. 13-

26 cv-04843-JD, 2014 WL 4684429 (N.D. Cal. Sept. 19, 2014), Judge Donato invalidated two

27 claims reciting a computer-readable medium and an electronic system for facilitating

28 communications, finding that the claims recite abstract ideas for the "commonplace and time-

1    honored practice of interacting with customers to promote marketing and sales." *Id.* at *4.   In

2    *DietGoal Innovations LLC v. Bravo Media LLC*, No. 13 Civ. 8391 (PAE), 2014 WL 3582914, at

3    *3 (S.D.N.Y. July 8, 2014), the court invalidated claims for "computerized meal planning," given

4    that "humans have assuredly engaged at least in rudimentary meal-planning 'for millennia.'" *Id.*

5    at *10 (citation omitted).   In *Comcast IP Holdings I, LLC v. Sprint Commc'ns Co. L.P.*, No. 12-

6    205-RGA, 2014 WL 3542055, at *3 (D. Del. July 16, 2014), "the abstract idea at the heart of the

7    claim" was even more fundamental and ancient—the claim boiled down to "the very concept of a

8    decision," which, of course, is "a basic mental process upon which everyone relies," and thus is

9    not patentable. *Id.* at *3-4. In *Every Penny Counts, Inc. v. Wells Fargo Bank, N.A.*, No. 8:11-cv-

10   2826-T-23TBM, 2014 U.S. Dist. LEXIS 127369, at *2 (M.D. Fla. Sept. 11, 2014), the claimed

11   inventions covered "a method of and a system of automated saving or automated charitable

12   giving" by debiting small amounts of money with each transaction—merely "a computerized

13   application of a technique known from antiquity," as implemented in various forms over the

14   centuries. *Id.* at *3.  The list goes on.

15         The asserted claims in each of the Subject Patents are unpatentable because they seek to

16   exclude others from practicing abstract concepts such as organizing information, writing

17   instructions for a task, following those instructions to perform the task and monitoring whether

18   the task is completed in the time required by a contract, all of which are methods of organizing

19   human activities that have always existed. *See*, *e.g.*, *Alice*, 134 S. Ct. at 2356.  The fact that HP's

20   patents are drawn to applying these abstract ideas to a computer in the "IT service management"

21   industry does not make the underlying abstract ideas patentable. *See Accenture Global Servs. v.*

22   *Guidewire Software, Inc.,* 728 F.3d 1336, 1345 (Fed. Cir. 2013) (finding claims directed at

23   insurance transaction processing unpatentable because just applying an abstract idea "in a

24   computer environment and within the insurance industry . . . [does] not 'narrow, confine, or

25   otherwise tie down the claim.' . . . . simply implementing an abstract concept on a computer,

26   without meaningful limitations to that concept, does not transform a patent-ineligible claim into a

27   patent-eligible one."). To allow the claim to survive "would disproportionately risk preempting a

28   building block of human interaction, retarding rather than promoting progress, contrary to the

**DEFENDANT'S MOTION FOR SUMMARY**
**JUDGMENT UNDER SECTION 101**
**14-CV-00570-BLF**

1  very purpose patents are granted." *Walker Digital, LLC v. Google, Inc.*, No. 11-318-LPS, 2014

2  WL 4365245, at *12 (D. Del. Sept. 3, 2014).

3            **1.**      **The '683 Patent Claims the Unpatentable Abstract Idea of Monitoring**
   **Deadlines**

4

5          The asserted claims of the '683 Patent are directed to the abstract concept of monitoring

6  deadlines and providing an alert when a contractual deadline is approaching.  The concept of

7  monitoring deadlines to ensure compliance with contractual obligations has been a common IT

8  service management practice since long before the filing date of the '683 Patent.  Service Level

9  Agreements (SLAs) were a common way of governing how much time an IT service management

10  provider had to resolve a particular incident, and the time to resolve an incident was often based

11  on a severity level.  (*See, e.g.*, Morton Decl., Ex. 5 (Noel Bruton, Effective User Support: How to

12  Manage the IT Help Desk, (1995)) at 105-113 ("All SLAs need managing.  Issues of management

13  include monitoring . . . [m]ost commercially available helpdesk management software packages

14  now have a means of setting target response times and reporting on a failure to meet them."); *id.*,

15  Ex. 6 (Best Practice for Service Support: CCTA (2000)) at 86 ("The Service Desk is responsible

16  for owning and overseeing the resolution of all outstanding Incidents . . . regularly monitor the

17  status and progress towards resolution and against service levels of all open Incidents."); *id.*

18  ("Identify Incidents that are liable to breach agreed service level targets and inform the assigned

19  solver."); *id.* at 87 ("Agree on escalation values and processes such as: when 75% of the agreed

20  time for resolution has elapsed and the request is still unresolved, the Service Desk should consult

21  with the assigned solver on progress."); Morton Decl., Ex. 7 (Gary Walker, IT Problem

22  Management (2001)) at 177-78 ("All service center-related SLAs should contain the following

23  information: . . .  Definitions of request priorities and response times . . ."); *id.* at 115 (table of

24  sample priority levels and response times).)

25

26

27

28

**DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT UNDER SECTION 101
14-CV-00570-BLF**

Table 7–2   Sample Service Center Priority Level and Initial Response Times

| Priority Level | Severity | Tier 1 | Work Time Before Escalating* | Tier 2 Initial Response Time** | Work Time Before Escalating | Tier 3 Initial Response Time*** | Target Resolution Time |
|---|---|---|---|---|---|---|---|
| 1 | Critical | Take Call | 15 min. | 15 min. | 1 hour | 15 min. | 2 hours |
| 2 | Urgent | Take Call | 30 min. | 30 min. | 1 hour | 15 min. | 4 hours |
| 3 | Important | Take Call | 2 hours | 2 hours | 2 hours | 1 hour | 8 hours |
| 4 | Low | Take Call | 8 hours | 4 hours | 8 hours | 4 hours | 3 days |
| 5 | Monitor | Take Call | | | No Escalation | | |

*Tier 1 Work Time Before Escalating could be 0 minutes for some problems, such as hardware, which are automatically escalated to a tier 2 hardware resource pool.

**Tier 2 Initial Response Time is the length of time between the tier 1 service center escalation to tier 2 and the tier 2 response to the request for service. In other words, this indicates the maximum time the escalated problem can sit in queue before a tier 2 agent takes ownership of the problem and begins work.

***Tier 3 Initial Response Time is the length of time between the tier 2 service center escalation to tier 3 and the tier 3 response to the request for service. As above, it represents the maximum amount of time the problem can sit in a tier 3 queue before an agent takes ownership.

Given the abstract nature of the concept claimed by the '683 Patent, it is not surprising that this motion is not the first time HP's '683 Patent was subjected to a Section 101 challenge. Long before the Supreme Court's decisions in *Bilski*, *Mayo* and *Alice* confirmed the test for unpatentable subject matter, the examiner rejected claim 1 and its dependent claims during prosecution on Section 101 grounds.  (Morton Decl., Ex. 8 (11/19/2008 Office Action) at 3 ("[C]laims 1-11 are non-statutory since they may be performed within the human mind.")   The patentee overcame that rejection by merely adding "in a computer system" into the preamble of independent claim 1.   (Morton Decl., Ex. 9 (02/18/2009 Office Action Response) at 10 ("Applicants have amended independent claim 1 and assert that claim 1 as now present [sic] is tied to the use of a specific machine.  Claim 1 has been amended to recite in-part "A method in a computer system, . . . ."); Morton Decl., Ex. 10 (05/06/2009 Examiners  Final Rejection) at 2 ("The rejection of claims 1-11 under 35 USC § 101 is withdrawn in light of Applicant's amendment.").)

However, *Alice* and its progeny made clear that a Section 101 rejection can no longer be overcome by amending a claim to recite "in a computer system" because merely taking an abstract idea that can be performed within the human mind and performing it "in a computer system" does not make that abstract idea patentable. *See, e.g.*, *Alice*, 134 S. Ct. at 2358; *Bancorp Servs. LLC v. Sun Life Assur. Co. of Canada*, 687 F.3d 1266, 1279 (Fed. Cir. 2012) ("Using a

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT UNDER SECTION 101
14-CV-00570-BLF

1  computer to accelerate an ineligible mental process does not make that process patent-eligible.").

2  In recognition of the trends in Section 101 jurisprudence, HP tellingly dropped 13 of the

3  16 claims originally asserted from the '683 Patent, including the previously rejected claim 1 and

4  its dependents, reducing its asserted claims down to Claims 12, 32 and 35 of the '683 Patent.

5  (Morton Decl., Ex. 11 (Hewlett-Packard Company's Amended Disclosure of Asserted Claims and

6  Infringement Contentions).)  However, HP's remaining computer program product[4] and system

7  independent claims are not patent eligible either.  Independent claim 32 recites virtually the same

8  unpatentable process of tracking deadlines in claim 1, adding only generic computer hardware

9  including a "monitoring server", "a database" and "a help desk client." Claim 32's recitation of

10 that generic computer hardware does not salvage its patentability, because the mere addition of

11 basic computer hardware does not "necessarily turn[] an abstraction into something concrete."

12 *Ultramercial*, 772 F.3d at 715, 717 ("adding a computer to otherwise conventional steps does not

13 make an invention patent-eligible."); *see also Walker Digital*, 2014 WL 4365245, at *6, *10.

14 To help illustrate the unpatentable nature of the claimed subject matter, the exemplary

15 claim chart below demonstrates how the service ticket monitoring process in the limitations of

16 independent claim 32 and dependent claim 35 of the '683 Patent cover nothing more than an

17 abstract process that can be performed by a person without a computer.  In this example, a help

18 desk worker tasked with monitoring service tickets performs the same actions as the claimed

19 system, but the help desk worker, a notebook and a bulletin board replace the monitoring server,

20 database and help desk client, respectively. Indeed, the specification expressly notes that the

21 purported invention merely covers using a computer to track levels of service that help desk users

22 had manually performed:

23  The monitoring system of the present invention helps agents 104 focus more on
   their day to day activities rather than exerting manual effort to effectively manage
24  Level of Service guaranteed to the customer 102. Knowing that the monitoring
   program will notify him/her and their team when a ticket requires prompt
25  attention, the helpdesk can concentrate on better servicing the customer and reduce

26 _____
[4] Also known as a Beauregard claim, computer program product claims a computer readable
27 medium (e.g., a disk, hard drive, or other data storage device) containing program instructions for
   a computer to perform a particular process. *See CyberSource Corp. v. Retail Decisions, Inc.*, 654
28 F.3d 1366, 1373 (Fed. Cir. 2011).

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UNDER SECTION 101**
**14-CV-00570-BLF**

the volume of tickets missing Level of Service agreements.

('683 Patent, 4:23-30.)

Because the only meaningful difference between the claim language and the human's performance of the ticket monitoring system is that the computer may be able to perform the task faster or with fewer help desk workers, the claim is not patentable.  *See BuySAFE, Inc. v. Google, Inc.,* 964 F. Supp. 2d 331, 336 (D. Del. 2013) ("In fact, the patent's process would be performed exactly the same way by a person and by a computer, the only difference being that the computer performs the process significantly faster than a human. Such a process is not patent-eligible.").

| Limitations of '683 Claims 32 and 35 | Steps Performed Without a Computer |
| --- | --- |
| 32.  A system for monitoring service tickets in order to provide reminders to a help desk user of impending times for actions, the times for actions being provided according to a level of service required to be provided to a customer pursuant to a contract between the customer and a service provider, the system comprising: | A help desk worker is assigned to monitor service tickets to ensure that levels of service are provided to a customer in accordance with a contractual agreement. |
| a monitoring server; | A help desk worker is assigned to monitor the service tickets received by a help desk. |
| a database; and | A help desk worker uses a notebook to keep track of the service tickets. |
| a help desk client; | A help desk worker uses a bulletin board to post status updates about service tickets. |
| wherein the database stores tickets and information regarding ticket types, ticket severities based on the contract, and corresponding contractually required times for actions to be performed for each of the ticket types and ticket severities; | The help desk worker records in the notebook: (1) the service tickets, (2) information regarding the ticket types, (3) the severities of the service tickets, and (4) the contractually required times for the actions to be performed for each of the ticket types and ticket severities. |
| the monitoring server monitors tickets in the database, determines when times for actions are approaching, and sends alerts to the help desk client alerting the help desk user that a time to take a specified action is approaching; | The help desk worker monitors the status of the tickets recorded in the notebook.  The help desk worker determines that a time to take action on a service ticket is approaching and posts an alert message on the bulletin board for her colleagues to see that the time to take action is approaching. |
| and the help desk client displays active tickets to a help desk user and provides alerts received from the monitoring server to the help desk | The help desk worker posts the active service tickets on the bulletin board and alerts colleagues when necessary. |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UNDER SECTION 101**
**14-CV-00570-BLF**

| | |
|---|---|
| user. | |
| 35. The system as recited in claim 32, wherein the active tickets displayed are only those that have reached a predetermined percentage of the time before their due date. | The help desk worker only affixes the active service tickets to the bulletin board if the ticket has reached a predetermined percentage of time before the due date. |

Independent claim 12 is also unpatentable because it claims essentially the same unpatentable abstract ideas as claims 32 and 35, only written in computer program product (or Beauregard) format. *See Digital-Vending Servs. v. Univ. of Phoenix*, 672 F.3d 1270, 1275 n.1 (Fed. Cir. 2012) (treating claims to a computer-readable medium as method claims, reasoning that "[s]uch functionally-defined claims should be treated as method claims to avoid exalting form over substance") (quoting *CyberSource*, 654 F.3d at 1374).

| Limitations of '683 Claim 12 | Steps Performed Without a Computer |
|---|---|
| 12. A computer program product in a non-transitory computer readable media for use in a data processing system for monitoring service tickets for information technology service providers to ensure that levels of service required to be provided to a customer pursuant to a contractual agreement between the customer and a service provider, are met, the computer program product comprising: | A help desk worker is assigned to monitor service tickets to ensure that levels of service are provided to a customer in accordance with a contractual agreement. |
| first instructions for inspecting a service ticket in a database to determine a deadline for when a problem associated with the service ticket must be resolved, with the deadline based upon a contractually determined severity of the problem and a corresponding contractually required time for resolution of the problem; | A help desk worker is assigned to inspect the service tickets in her notebook to determine the deadlines when those tickets must be resolved based on a contractually determined severity level and a contractually required time for resolution. |
| display instructions for displaying, on a display device at the help desk, a graphical display populated with representations of service tickets that have reached a predetermined percentage of the time before their due date; | A help desk worker is assigned to post the service tickets that have reached a predetermined percentage of the time before their due date on the bulletin board. |
| second instructions for determining an deadline approaching alert time at which a help desk user must be notified that the deadline for | A help desk worker is assigned to determine a deadline when the help desk team must be notified that the deadline for resolving the |

| Limitations of '683 Claim 12 | Steps Performed Without a Computer |
|---|---|
| resolving the problem must be met; | problem must be met. |
| and third instructions for alerting the help desk user that the deadline for resolving the problem is approaching when the deadline approaching alert time is reached. | A help desk worker is assigned to alert the help desk team that the deadline for resolving the problem is approaching when the deadline is reached. |

## 2. The '802 Patent Claims the Unpatentable Abstract Idea of Writing Instructions

Like the '683 Patent, the '802 Patent claims an abstract idea, specifically a user sitting down to write up instructions for a process (a "workflow") and then checking her work to make sure that process has appropriate transitions between the steps. Indeed, the '802 Patent expressly recognizes that IT staff conventionally referred to and updated workflow documentation manually:

> According to conventional methods, the IT incidents are typically referred to the IT staff and handled manually by the IT staff with assistance from documentation, knowledge bases, and scripts. The IT staff typically comprises a team of dedicated technical professionals. The documentation, knowledge bases, and scripts also need to be manually updated periodically as new IT incidents keep occurring. However, as a result of IT infrastructure complexity and a need to reduce IT failures, automation of IT incident management is required. The ability to identify the root cause of IT failures, document solutions, and automate the problem-resolution processes can enhance the performance of the IT infrastructure.

('802 Patent, 1:33-46.)

As acknowledged by the '802 Patent, workflow definition and management has been a fundamental business practice in the IT industry for decades. (*See* Morton Decl., Ex. 12 (Stefan Jablonski and Christoph Bussler, Workflow Management: Modeling Concepts, Architecture and Implementation (1996)) at 5-6 ("Many analysts in the computer industry tout workflow management as the software technology of the 1990s.").) Professionals in the IT service management industry have been developing and implementing workflows since at least the 1990s. (*Id*., Ex. 5 at 158-60 ("Figure 23.1 is an example of the sort of flowchart one might use to document part of the work in a User Support environment. This chart shows the workflow as seen from the problem resolver's point of view. . . . The flow charts you create can then become part of your procedures manual."); *id*., Ex. 13 (Microsoft Sourcebook for the Help Desk (1997,

2d. Ed.)) at 127-28 ("One particularly simple, yet helpful tool is a problem-solving flowchart that can work as a map guiding the support engineer to the problem's solution. . . . Typically, the flowchart illustrates the process of resolving a common problem.  The flowchart starts with a question to ask or a test to perform.   Based on the result, the flowchart indicates a different question or test.  The process continues until the proper solution is found.").)

As illustrated in the table of exemplary claim 1 below, the claimed process is not patentable because the long-standing process of developing workflows to solve problems can be performed in the human mind and then recorded in any media, such as on a computer or in a notebook using pen and paper.  *See CyberSource*, 654 F. 3d at 1373 ("[A] method that can be performed by human thought alone is merely an abstract idea and is not patent-eligible under § 101."); *Bancorp*, 687 F.3d at 1279  ("Using a computer to accelerate an ineligible mental process does not make that process patent-eligible"); *see also BuySAFE,* 964 F. Supp. 2d at 336.

| Limitations of '802 Patent Claim 1 | Steps Performed Without a Computer |
|---|---|
| 1.  A  computer  implemented  method  for facilitating a user in defining a repair workflow for  subsequent  use  in  resolving  information technology (IT) incidents, comprising: | The help desk worker sits down at a desk with notebook to write up instructions about resolving IT incidents. |
| facilitating the user in defining a plurality of steps of the repair workflow using a computing device, wherein facilitating the user in defining a plurality of steps comprises facilitating the user in defining a plurality  of  operations  for  the  steps,  and defining inputs and outputs of the operations; | The help desk worker records the steps for resolving the IT incidents in the notebook; the help desk worker identifies and records the operations in each of the steps; the help desk worker also identifies and records the inputs and outputs of each of the operations. |
| facilitating  the  user  in  defining  a  plurality  of transitions between the steps, based at least in part on the outputs of the steps, using a computing device; and | The help desk worker identifies and records the transitions between the steps based on the outputs of the steps on paper. |
| checking  the  defined  repair  workflow  for correctness before being used to resolve an IT incident  using  a  computing  device,  wherein checking  the  defined  repair  workflow  for correctness includes verifying that each response of each step's operation has a transition to another step. | The help desk worker checks the instructions for correctness by reviewing and verifying that each step has a transition to another step. |

Dependent claims 2, 3 and 5 suffer from the same fatal issues as claim 1.  Even though

several of the steps reference "code", the claims are still not patentable because at its most fundamental level the claimed "code" is merely additional instructions that allow the computer to perform the operation more quickly than a human may be able to perform it.  *See Bancorp*, 687 F.3d at 1279 ("Using a computer to accelerate an ineligible mental process does not make that process patent-eligible."); *BuySafe*, 964 F. Supp. 2d at 336.

| Claims Dependent on '802 Patent Claim 1 | Steps Performed Without a Computer |
|---|---|
| 2.  The method of claim 1, wherein said defining of a plurality of operations comprises attaching to the steps, a plurality of sets of executable code implementing the operations defined by the user. | The help desk worker attaches additional sets of instructions to the step. |
| 3.  The method of claim 1, wherein said facilitating of the user in defining a plurality of transitions between the steps comprises attaching to the transitions, a plurality of sets of parsing code for processing the outputs. | The help desk worker attaches instructions to focus on certain information when reviewing the output of the operations. |
| 5.  The method of claim 1, wherein said facilitating of the user in defining a plurality of transitions between the steps comprises attaching to the steps, a plurality of sets of executable code for processing the outputs. | The help desk worker attaches additional sets of instructions to review the output of the operations. |

Independent claim 15 is another computer program product (or Beauregard) claim that is also unpatentable for the same reasons as claim 1.  As discussed above, the fact that the claims are written in computer program product format has no bearing on whether the claims are drawn to unpatentable subject matter.  *See Digital-Vending,* 672 F.3d at 1275 n.1.

### 3.    The '512 Patent Claims the Unpatentable Abstract Idea of Following Instructions

The asserted claims of the '512 Patent[5] (which is the parent patent of the '802 Patent) are directed to the abstract idea of following instructions (that were written by the abstract idea claimed in the'802 Patent) and taking notes while following those instructions.  The '512 Patent includes the admission noted above that "conventional methods" of IT service management required IT staff to handle the incidents manually "with assistance from documentation,

---

[5] Plaintiff asserts that ServiceNow infringes Claims 1, 3, 4, 5 and 7 of the '512 Patent.  (Morton Ex. 11 at 2.)

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UNDER SECTION 101**
**14-CV-00570-BLF**

knowledge bases, and scripts." ('512 Patent, 1:26-29.)  Indeed, the Bruton reference describes following a workflow and gathering information as the workflow proceeds in an attempt to solve an incident at an IT help desk.  (*See* Morton Decl., Ex. 5 at 160 ("The resolver claims a query from the list of outstanding ones. . . . Some prediagnosis may have to be done, and an assessment made if any further information is needed from the user. . . . If the user is there, we get the information we need and assess if we have everything else we need to solve this problem X.").)  As shown in the table of exemplary claim 1 of the '512 Patent, the abstract idea is not patentable because each of the steps can be performed by our exemplary help desk worker in her mind and then recorded in any media, such as in a notebook using pen and paper.  *See CyberSource*, 654 F. 3d at 1373; *Bancorp Serv,* 687 F.3d at 1279; *BuySAFE,* 964 F. Supp. 2d at 336.

| Limitations of '512 Claim 1 | Steps Performed Without a Computer |
|---|---|
| 1.  A  computer  implemented  method  for resolving  an  information  technology  (IT) incident, comprising: | |
| loading a repair workflow having a plurality of steps and transitions between the steps, defined to repair the IT incident on a computing device, each of the steps having one or more inputs, processing logic for the input(s) and one or more outputs; | The help desk worker looks up the instructions for finding a lost file in the computer repair manual. |
| creating a repair frame for the loaded repair workflow on the computing device; | The help desk worker obtains a notebook to keep notes in while following the instructions for finding a lost file in the computer repair manual. |
| creating a repair context for the repair frame on the  computing  device,  and  populating  the repair frame with configuration data; | The help desk worker designates two pages for keeping notes about the repair.<br><br>On the first page, the help desk worker will keep notes about the repair.<br><br>On the second page, the help desk worker takes notes  to  record  the  configuration  of  the computer she is fixing. |
| binding one or more data values to the one or more inputs of one of the steps within the repair context; | On the first page of her notebook, the help desk worker looks up a directory of files and writes down the names of each of the files in that directory. |
| processing the bound data values of the one or more  inputs  of  the  step  within  the  repair | On the first page of her notebook, the help desk worker reviews the names of the files she has |

| context; | written down in her notebook. |
|---|---|
| executing the step's operation; | The help desk worker identifies whether the missing file is among the list of names she wrote down in her notebook. |
| extracting the one or more outputs of step within the context; and | The help desk worker looks at the file she identified in the previous step to determine if it includes the information she was looking for. |
| selecting a transition to transition to another step within the context, based at least in part on the extracted one or more outputs. | If the help desk worker found the file she was looking for, she is done. If the help desk technician cannot find the file she was looking for, she looks up another directory. |

Dependent claims 3-5 are also unpatentable because they only add mental decisions such as what task to do, whether it is permissible to do the task or whether the task is done. *See CyberSource*, 654 F.3d at 1373.

| Claims Dependent on '512 Claim 1 | Steps Performed Without a Computer |
|---|---|
| 3. The method of claim 2, further comprising receiving from a requester a request to resolve an IT incident, determining whether the user has requestor has requisite authority to make the request, and rejecting the request if the requestor is determined not to have the requisite authority to make the request. | The help desk worker notes in her notebook that she is starting the repair process.<br><br>The help desk worker looks up the requester in a directory of company personnel to determine if that person is allowed to receive repair support. If the requester is not in the directory, the help desk technician rejects the requester. |
| 4. The method of claim 1, further comprising moving the step to the selected transition's destination, determining whether the selected transition's destination is a return step[6], and if so, select a response of the return step as a response of the repair workflow. | After finding the file she was looking for, the help desk worker determines that the issue was resolved. |
| 5. The method of claim 4, further comprising storing a record of the processing of the step in a repair history log. | The help desk worker designates a third page in her notebook to keep a note about the files she reviewed in the "processing" step. |

While claim 7 of the '512 Patent is written as a system claim, other than the recitation of a generic computer storage device and generic processor, the claim merely repeats the same method steps recited in claim 1. The recitation of generic computer hardware is insufficient to make the

---

[6] A "return step" is described in the specification as the status of the workflow after the repair workflow has been executed (e.g., RESOLVED, DIAGNOSED, NO ACTION TAKEN, ERROR). ('512 Patent, 4:34-52.)

1   abstract idea expressed in the method portion of the claim patentable.  *See, e.g.*, *Ultramercial*, 772

2   F.3d at 717, at *6; *Walker Digital*, 2014 WL 4365245, at *6, *10.

3   **4.   The '229 Patent Claims the Unpatentable Abstract Idea of Organizing Information in a Hierarchy for Later Access**

4

5   The asserted claims of the '229 Patent[7] are directed to the abstract idea of categorizing and

6   organizing information into a hierarchy.   These claims are unpatentable. In fact, the Federal

7   Circuit has recently held that the "well known concept of categorical data storage" like these was

8   unpatentable subject matter:

9       [U]sing categories to organize, store, and transmit information is well-established.
10      Here, the well known concept of categorical data storage, i.e., the idea of
        collecting information in classified form, then separating and transmitting that
11      information according to its classification, is an abstract idea that is not patent-
        eligible.
12
    *Cyberfone Sys., Inc. v. CNN Interactive Grp., Inc*., 558 F. App'x 988, 992 (Fed. Cir. 2014).

13   Similarly, the Federal Circuit recently confirmed that merely "taking existing information . . . and

14   organizing this information into a new form" is an unpatentable abstract idea and that "a process

15   that employs mathematical algorithms to manipulate existing information to generate additional

16   information is not patent eligible."  *Digitech*, 758 F.3d at 1351.

17   Classification of information is "considered the most fundamental activity of the human

18   mind."  Morton Decl., Ex. 14 (Lois Mai Chan, Cataloging and Classification: An Introduction

19   (1994)).)  And classifying that information into sub-groups and establishing relationships between

20   classes of information is an essential aspect of classification:

21
22      The essential act of classification is the multistage process of deciding on a
        property or characteristic of interest, distinguishing things or objects that possess
23      that property from those which lack it, and grouping things or objects that have the
        property or characteristic in common into a class.   Other essential aspects of
24      classification are establishing relationships among classes and making distinctions
        within classes to arrive at subclasses and finer divisions.
25
    (*Id.,* Ex. 14 at 259.)

26   For hundreds, if not thousands of years, people have categorized information by subject

27   _____

28   [7] Plaintiff asserts that ServiceNow infringes Claims 8-10, 13, 15, 17-20 of the '229 Patent. (Morton Decl. Ex. 11 at 2.)

matter in libraries and other information repositories.  (*See id*., Ex. 14 at 269; *id*., Ex. 15 (Classified Catalogue of the Carnegie Library of Pittsburg (1907)) at v-vii.)  The specification of the '229 Patent expressly recognizes this fact: "Information repositories can also be in non-automated form, such as library index cards comprising information like call numbers, publishers and authors." ('229 Patent, 1:35-38.)  One well known example of organizing information by categories and subcategories is the Dewey Decimal System.  In the Dewey Decimal System, "[c]lassification begins with the universe of knowledge as a whole and divides it into successive stages of classes and subclasses . . . the progression is from the general to the specific, forming a hierarchical, or 'tree,' structure, each class being a species of the class on the preceding level and a genus to the one below it."  (Morton Decl., Ex. 14 at 260.)  An example of classification of information via the Dewey Decimal System is shown below.

> 500 Natural sciences and mathematics
> 510 Mathematics
> 516 Geometry
> 516.3 Analytic geometries
> 516.37 Metric differential geometries
> 516.372 Euclidean Geometry

(*Id*. at 279.)  The organization of the Dewey Decimal System is remarkably similar to the organization of information described in the '229 Patent:

1

2

3

4

5

6

7

8

9

10



*FIG. 11*

11    In the example above, the category of jobs contains several categories of jobs, including

12  "Technical/Professional" and others.   The "Technical/Professional" category then includes

13  different technical areas, including "Computers" and "Electronics."   Then the "Computers"

14  technical area includes jobs in the "Repair" and the "Programming" fields.  Each of the levels in

15  the hierarchy in Figure 11 of the '229 Patent is practically identical to the categories and

16  subcategories of information in a system like the Dewey Decimal System.

17    The '229 Patent also shares remarkable similarities with a patent recently invalidated

18  under Section 101 by Judge Whyte.  *Cogent,* 2014 WL 4966326, at *4.  The *Cogent* claims were

19  directed to the abstract idea of "maintaining and searching a library of information."  In fact, the

20  patent at issue in Cogent described

21  hierarchical organizational structures (at

22  right) that are substantively similar to

23  the organization of information

24  described in the '229 Patent. (*See*

25  Morton Decl., Ex. 16 (U.S. Patent No.

26  7,133,879).) Judge Whyte held that this

27  abstract idea was unpatentable because

28  the idea was "little different than the basic concept of organizing a physical library so that an



FIG. 2

18.

individual can search for information by going to the relevant portion of the library and picking a book." *Cogent,* 2014 WL 4966326, at *4.

Using the Dewey Decimal System example above, the chart of exemplary claim 8 below demonstrates that the claim is directed to nothing more than the abstract idea of organizing information in a hierarchy—like the Dewey Decimal System:

| Limitations of '229 Claim 8 | Steps Performed Without A Computer |
|---|---|
| 8. Apparatus for accessing an information repository, comprising: | A librarian goes to the natural sciences and mathematics floor of the library to find the book "The Foundations of Euclidean Geometry." |
| a. a number of computer readable media; and<br>b. computer readable program code stored on said number of computer readable media, said computer readable program code comprising:<br>i. code for creating a hierarchy of derived containers, wherein a given derived container corresponds to: | The librarian finds that the books were previously divided into a hierarchy based on the Dewey Decimal System, including section 516, which includes the geometry books. |
| (1) a container definition node of an information model, said information model comprising a hierarchy of container definition nodes; and | The librarian finds that the geometry books are divided into a number of groups and subgroups (derived containers) based on the Dewey Decimal System (an information model comprising a hierarchy). Within the group of geometry books, the librarian finds that the books about analytic geometries (section 516.3). Within the analytic geometries group, she finds there is a group about metric differential geometries (section 516.37). |
| (2) a category of information stored in said information repository; | Each of the groups of books about geometries includes a number of books on various analytical geometry subjects, including books on metric differential geometry. |
| ii. code for displaying given ones of said derived containers to a computer user; and | The librarian reviews the books on the shelves in the metric differential geometry group. |
| iii. code for determining if a given one of said displayed derived containers has been selected by a computer user, and upon selection of said given one of said displayed derived containers, displaying | The librarian looks through the metric differential geometry group, finds the book "The Foundations of Euclidean Geometry," takes the book off the shelf and reviews the contents of the book. |

19.

| Limitations of '229 Claim 8 | Steps Performed Without A Computer |
|---|---|
| contents of said given one of said displayed derived containers. | |

Dependent claims 9, 10, 13 and 15 are similarly drawn to unpatentable subject matter as they merely discuss what happens further down in the hierarchy (Claim 9's "child derived containers," e.g., the grouping of books for "Euclidean Geometry" section 516.372 in the Dewey Decimal System) or the origin of information in those containers (Claim 10's "some derived containers comprise . . . information extracted from said information repository"). Claim 13 is directed to the further abstract concept of using a card catalog and shelf labels or signs with arrows (pointers) to identify where particular books are located in the library ("various ones of the container definition nodes forming said information model comprise pointers which establish a hierarchical relationship between said container definition nodes"). Claim 15 is directed to nothing more than a description of the Dewey Decimal System, which starts from broad subject matter areas that further narrow as the topic becomes more specific, but the narrower topic relates to the broader subject matter area it is derived from (e.g., 516.372 Euclidean Geometry is narrower than 516 Geometry).

The remaining asserted claims (independent claims 17 and 18 and dependent claims 19 and 20) cover essentially the same abstract subject matter as independent claim 8 and its asserted dependents. The only meaningful difference in Claim 17 is the inclusion of "leaf nodes," which is simply a subject at the bottom of the hierarchy, as opposed to the top (e.g., 516.372 Euclidean Geometry as opposed to 516 Geometry in the Dewey Decimal System example). Claim 18 and dependent claims 19 and 20 have no meaningful differences from independent claim 8 and its dependent claims 9 and 10, as it covers the same subject matter but is claimed as a method claim rather than a computer program product claim.

**B.      Alice Step 2 - The Asserted Claims Do Not Contain Anything that Transforms the Patent-Ineligible Abstract Ideas into Patent-Eligible Inventions**

*Alice*'s second step requires the Court to "examine the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2357 (quotation marks omitted). A valid claim

must include "additional features" beyond the abstract idea itself, which "requires more than simply stating the abstract idea while adding the words 'apply it.'" *Id.* (quotation marks and brackets omitted).   It also requires more than the recitation of "well-understood, routine, conventional activity" or technology.   *Mayo*, 132 S. Ct. at 1294.   In particular, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention," particularly given "the ubiquity of computers."   *Alice*, 134 S. Ct. at 2358. "Thus, if a patent's recitation of a computer amounts to a mere instruction to implement an abstract idea on a computer, that addition cannot impart patent eligibility." *Id.* (citation, quotation marks, ellipses and brackets omitted).   As the Federal Circuit recently held in *Ultramercial*, "adding a computer to otherwise conventional steps does not make an invention patent-eligible. . . . [a]ny transformation from the use of computers or the transfer of content between computers is merely what computers do and does not change the analysis." *Ultramercial,* 772 F.3d at 717.

Here, all of the asserted claims of the Subject Patents do not add any "inventive concept sufficient to transform the claimed abstract into a patent-eligible application." *Alice*, 134 S. Ct. at 2357.   Each of the asserted claims of the Subject Patents recite only generic and conventional computer-related limitations. '683 Patent, Claims 12, 32, 35; '802 Patent, Claims 1-3, 5, 15; '512 Patent, Claims 1, 3-5, 7; and '229 Patent, Claims 8-10, 13, 15, 17-20.   None of the asserted claims mentions or envisions any special technology or programming. *Open Text*, 2014 WL 4684429, at *2 (invalidating claims under Section 101 that incorporated "[n]o special technology or programming" and that implemented the abstract idea "on a generic computer system without any meaningful limitations").

The patent specifications in the Subject Patents likewise describe only conventional, generic computer and network structures, to be programmed with unspecified software.  *See* '683 Patent, 5:1-6:30; 11:23-44;'802 Patent, 2:43-3:13; '512 Patent, 2:36-3:11; 12:17-55 (describing a computer system that "comprises a computer, an input device, a display unit and the Internet."); '229 Patent, 2:51-60; 15:1-6 (stating the preferred embodiment is directed to generic "databases" but the invention could be used to "organize information in any kind of information repository").  Thus, the use of generic computer and network structures was merely "well-understood, routine,

conventional activity, previously engaged in by those in the field" at the time of the alleged inventions. *Mayo*, 132 S. Ct. at 1299-1300. Indeed, in the example of the '683 Patent, the patentee overcame a Section 101 rejection (prior to the Court's rulings in *Bilski*, *Mayo* and *Alice*) by merely adding the words "in a computer system." However, the law is now clear that "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2358.

Starting with '683 Claim 32 as a representative claim, it is clear that nothing in the claim transforms the abstract idea into a patent-eligible invention. The claim merely recites that the method is performed using a generic "monitoring server," "database," and "help desk client" that is programmed to store and monitor events and display alerts to users. These are all routine functions and components of any conventional computer system. *See Alice*, 134 S. Ct. at 2359 ("the use of a computer to obtain data, adjust account balances, and issue automated instructions . . . are well-understood, routine, conventional activities previously known to the industry"); *Ultramercial*, 772 F.3d at 717; *Open Text*, 2014 WL 4684429, at *5 (additional limitation regarding email server "merely builds on the same basic concept" with "a decades-old technology that is certainly not inventive"). The other claims in the '683 Patent fair no better, as they are all directed to generic, well-understood, routine, and conventional activities or technologies.

Similarly, the asserted claims of the '802 and '512 Patents include nothing that would transform the claimed abstract ideas into a patent-eligible invention. Those claims recite only routine "storage mediums" and "processors" in conventional computer systems. Likewise, the asserted claims of the '229 Patent fail to include anything transforming the abstract ideas, as they too only discuss applying the generic information storage techniques on a generic "apparatus" or standard "computer" with "code."

Finally, considering each claim as an "ordered combination" adds nothing to confer patent-eligibility. *Alice*, 134 S. Ct. at 2359-60. As in *Alice*, the "claims do not, for example, purport to improve the functioning of the computer itself. Nor do they effect an improvement in any other technology or technical field. Instead, the claims at issue amount to nothing significantly more than an instruction to apply the abstract idea"—such as organizing

1  information, writing instructions for a task, following those instructions to perform the task and

2  monitoring whether the task is completed in the time required by a contract —"using some

3  unspecified, generic computer." *Id.* (citations and quotation marks omitted).[8]  Under *Alice*, "that

4  is not enough to transform an abstract idea into a patent-eligible invention." *Id.* (quotation marks

5  omitted).

6  **IV.    CONCLUSION**

7          For the foregoing reasons, the Court should grant summary judgment and find that the

8  asserted claims of the Subject Patents are invalid under 35 U.S.C. § 101.

9

10

11  Dated:  December 17, 2014                        COOLEY LLP

12

13                                                                */s/ Heidi L. Keefe*
                                                                 Heidi L. Keefe
14                                                                Attorneys for Defendant
                                                                 ServiceNow, Inc.
15

16

17

18

19

20

21

22

23

---

24  [8]  Recent post-*Ultramercial* district court decisions have confirmed that claims directed to
     conventional practices performed with a computer that do not solve a problem arising only in the
25  realm of computers or computer networks—such as the asserted claims of the Subject Patents—
     are not patent-eligible. *See Joao Bock Transaction Sys., LLC v. Jack Henry & Assocs., Inc.*, No.
26  12-1138-SLR, 2014 U.S. Dist. LEXIS 172567, at *22-*23 (D. Del. Dec. 15, 2014) (discussing
     *DDR Holdings, LLC v. Hotels.com, L.P.*, No. 2013-1505, 2014 WL 6845152 (Fed. Cir. Dec. 5,
27  2014)); *IPLearn, LLC v. K12, Inc.*, No. 11-1026-RGA, 2014 U.S. Dist. LEXIS 173850, at *2-*3
     (D. Del. Dec. 17, 2014) (discussing *DDR Holdings*).

28

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT UNDER SECTION 101
14-CV-00570-BLF