# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

|  |  |
|---|---|
| HEWLETT PACKARD COMPANY,<br>Plaintiff,<br><br>v.<br><br>SERVICENOW, INC.,<br>Defendant. | Case No. 14-cv-00570-BLF<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY**<br><br>[Re: ECF 70] |

Defendant ServiceNow moves for summary judgment of invalidity of claims asserted against it under four U.S. patents. For the reasons below, the motion is **GRANTED.**

## I.    BACKGROUND

Plaintiff Hewlett Packard ("HP") brought this suit against Defendant ServiceNow, alleging infringement of eight patents. At issue in the present motion are claims 12, 32, and 35 of U.S. Patent 8,224,683; claims 8-10, 13, 15, and 17-20 of U.S. Patent 6,321,229; claims 1, 2, 3, 5, and 15 of U.S. Patent 7,890,802; and claims 1, 3, 4, 5, and 7 of U.S. Patent 7,610,512.[1] ServiceNow contends that these claims (collectively the "asserted claims") are invalid under 35 U.S.C § 101 for failing to claim patentable subject matter. Specifically, ServiceNow contends that the asserted claims are directed to abstract ideas, which the Supreme Court has long held fall outside the scope of § 101, *Alice Corp. v. CLS Bank Int'l*, 134 S.Ct. 2347, 2354 (2014).

The court held a hearing on January 29, 2015. HP argued that the parties' positions revealed underlying disputes as to the proper construction of critical claim terms and that construction of these claim terms would be necessary in order resolve the parties' ultimate dispute regarding patent-eligibility. *See* Hearing Transcript at 40:5-14, ECF 87. However, HP did not provide explicit proposed constructions of the claim terms it believed precluded summary judgment of invalidity,

---

[1] The full text of the challenged claims is reproduced in Appendix A.

United States District Court<br>Northern District of California

United States District Court
Northern District of California

explaining that it had understood the court's prior instructions to preclude claim construction prior to this summary judgment motion. The court, recognizing a misunderstanding, granted leave for HP to file proposed constructions; the court also granted ServiceNow leave to file additional briefing to address whether the patents at issue would be invalid under HP's proposed constructions. ECF 84. HP took the opportunity to file proposed constructions.[2] ECF 89. ServiceNow has accepted HP's proposed constructions for purposes of this motion and argued that the asserted claims are invalid even under the proposed constructions. ServiceNow's Supplemental Brief, ECF 91. The court will adopt HP's proposed constructions for purposes of this motion as well. *See Bascom Research, LLC v. LinkedIn, Inc.*, No. 12-cv-06293, 2015 WL 149480, at *12 (N.D. Cal. Jan. 5, 2015).

### A.    U.S. Patent 8,224,683

The '683 patent is directed toward optimizing the efficiency of providing IT helpdesk services. According to the patent's specification, "many businesses choose to contract . . . information technology (IT) specialists to install and maintain appropriate computer and network hardware and software necessary for the business to achieve its business objectives. . . . Typically, the contract requires the IT provider to maintain a helpdesk to which the business'[s] employees may call to notify the IT provider of problems with the computer system, network, or software. ¶ The helpdesk agent assigns each reported problem a service ticket." '683 patent at 1:27-40. The claims of the '683 patent are directed to a "system for monitoring service tickets in order to provide reminders to a help desk user of impending times for actions." Claim 12 of the '683 patent, which is representative for § 101 purposes,[3] recites:

> A computer program product in a non-transitory computer readable media for use in a data processing system for monitoring service tickets for information technology service providers to ensure that levels of service required to be provided to a customer pursuant to a contractual agreement between the

---

[2] The constructions submitted by HP are reproduced in Appendix B.

[3] Although HP has not stipulated that Claim 12 is representative for § 101 purposes, both parties argued the patent's validity in general terms, without identifying differences among the claims that would change the § 101 analysis. After reviewing the asserted claims, the court concludes that Claim 12 is representative for § 101 purposes "because all the claims are substantially similar and linked to the same abstract idea." *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (internal citations omitted).

United States District Court
Northern District of California

customer and a service provider, are met, the computer program product comprising:

> first instructions for inspecting a service ticket in a database to determine a deadline for when a problem associated with the service ticket must be resolved, with the deadline based upon a contractually determined severity of the problem and a corresponding contractually required time for resolution of the problem;
>
> display instructions for displaying, on a display device at the help desk, a graphical display populated with representations of service tickets that have reached a predetermined percentage of the time before their due date;
>
> second instructions for determining an deadline approaching alert time at which a help desk user must be notified that the deadline for resolving the problem must be met; and
>
> third instructions for alerting the help desk user that the deadline for resolving the problem is approaching when the deadline approaching alert time is reached.

## B.   U.S. PATENT 6,321,229

The '229 patent is directed toward accessing information in an information repository, such as a computer database. Recognizing the utility of displaying information hierarchically, the '229 patent claims a method and apparatus for accessing a repository's information in a way that it may be displayed to a user in hierarchical form. Claim 8 of the '229 patent, representative for § 101 purposes,[4] recites:

> Apparatus for accessing an information repository, comprising:
> a. a number of computer readable media; and
> b. computer readable program code stored on said number of computer readable media, said computer readable program code comprising:
>> i. code for creating a hierarchy of derived containers, wherein a given derived container corresponds to:
>>> (1) a container definition node of an information model, said information model comprising a hierarchy of container definition nodes; and
>>> (2) a category of information stored in said information repository;
>> ii. code for displaying given ones of said derived containers to a computer user; and
>> iii. code for determining if a given one of said displayed derived containers has been selected by a computer user, and upon selection of said given one of said displayed derived containers, displaying contents of said given one of said displayed derived containers.

---

[4] Although HP has not stipulated that Claim 8 is representative for § 101 purposes, both parties argued the patent's validity in general terms, without identifying differences among the claims that would change the § 101 analysis. After reviewing the asserted claims, the court concludes that Claim 8 is representative for § 101 purposes "because all the claims are substantially similar and linked to the same abstract idea." *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (internal citations omitted).

C.    U.S. Patents 7,890,802 and 7,610,512

The '802 and '512 patents, which share a specification, are directed toward automating workflows for resolving IT incidents. The '802 patent's claims focus on the creation of these automated IT workflows, while the '512 patent's claims focus on running the automated IT workflows. Claim 1 of the '802 patent, representative for § 101 purposes,[5] recites:

> A computer implemented method for facilitating a user in defining a repair workflow for subsequent use in resolving information technology (IT) incidents, comprising:
>> facilitating the user in defining a plurality of steps of the repair workflow using a computing device, wherein facilitating the user in defining a plurality of steps comprises facilitating the user in defining a plurality of operations for the steps, and defining inputs and outputs of the operations;
>> facilitating the user in defining a plurality of transitions between the steps, based at least in part on the outputs of the steps, using a computing device; and
>> checking the defined repair workflow for correctness before being used to resolve an IT incident using a computing device, wherein checking the defined repair workflow for correctness includes verifying that each response of each step's operation has a transition to another step.

Claim 1 of the '512 patent, representative for § 101 purposes,[6] recites:

> A computer implemented method for resolving an information technology (IT) incident, comprising:
>> loading a repair workflow having a plurality of steps and transitions between the steps, defined to repair the IT incident on a computing device, each of the steps having one or more inputs, processing logic for the input(s) and one or more outputs;
>> creating a repair frame for the loaded repair workflow on the computing device;
>> creating a repair context for the repair frame on the computing device, and populating the repair frame with configuration data;
>> binding one or more data values to the one or more inputs of one of the steps within the repair context;

---

[5] Although HP has not stipulated that Claim 1 is representative for § 101 purposes, both parties argued the patent's validity in general terms, without identifying differences among the claims that would change the § 101 analysis. After reviewing the asserted claims, the court concludes that Claim 1 is representative for § 101 purposes "because all the claims are substantially similar and linked to the same abstract idea." *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (internal citations omitted).

[6] Although HP has not stipulated that Claim 1 is representative for § 101 purposes, both parties argued the patent's validity in general terms, without identifying differences among the claims that would change the § 101 analysis. After reviewing the asserted claims, the court concludes that Claim 1 is representative for § 101 purposes "because all the claims are substantially similar and linked to the same abstract idea." *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (internal citations omitted).

United States District Court
Northern District of California

> processing the bound data values of the one or more inputs of the step
>     within the repair context;
> executing the step's operation;
> extracting the one or more outputs of step within the context; and
> selecting a transition to transition to another step within the context,
>     based at least in part on the extracted one or more outputs.

## II.   LEGAL STANDARD

### A.   MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The Supreme Court's 1986 "trilogy" of *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), requires that a party seeking summary judgment show the absence of a genuine issue of material fact. Once the moving party has done so, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *See Celotex*, 477 U.S. at 324. "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "If the [opposing party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50. "[I]nferences to be drawn from the underlying facts," however, "must be viewed in the light most favorable to the party opposing the motion." *See Matsushita*, 475 U.S. at 587.

### B.   PATENT-ELIGIBLE SUBJECT MATTER

Section 101 of the Patent Act defines the classes of patentable subject matter: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101.

Despite the apparent breadth of this language, § 101 has long contained "an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Ass'n for Molecular Pathology v. Myriad Genetics*, 133 S.Ct. 2107, 2116 (2013) (quoting *Mayo Collaborative*

*Services v. Prometheus Laboratories*, 132 S.Ct. 1289, 1293 (2012)). The Supreme Court recently reaffirmed this principle in *Alice Corp. v. CLS Bank Int'l*, 134 S.Ct. 2347 (2014). The "concern that drives this exclusionary principle [is] one of pre-emption. . . . Monopolization of [laws of nature, natural phenomena, and abstract ideas] through the grant of a patent might tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws." *Id.* at 2354.

However, the Supreme Court has repeatedly stressed the need to "tread carefully in construing this exclusionary principle lest it swallow all of patent law. At some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas. Thus, an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Id.* (internal citations omitted).

The Supreme Court has set forth a "framework for distinguishing patents that claim . . . abstract ideas from those that claim patent-eligible applications of those concepts. First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask, 'what else is there in the claims before us?' . . . to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* at 2355 (internal citations omitted). Step two of the analysis is a "search for an 'inventive concept'—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* (internal citations omitted).

Because patents are presumed valid, *see* 35 U.S.C. § 282, an alleged infringer asserting an invalidity defense bears the burden of proving invalidity by clear and convincing evidence. *Microsoft Corp. v. i4i L.P.*, 131 S.Ct. 2238, 2242 (2011).

## III. DISCUSSION

### A. U.S. PATENT 8,224,683

ServiceNow argues that the '683 patent claims the abstract idea of monitoring deadlines and providing an alert when a deadline is approaching. Opening Brief at 6, ECF 70. HP's expert describes the '683 patent as disclosing "a technological innovation that reduces the average time to resolve an IT incident." Menascé Decl. at ¶ 46, ECF 79-10. Dr. Menascé generally describes the

United States District Court
Northern District of California

1    benefit of the '683 patent in terms of its ability to handle large volumes of service requests, each

2    with its own contractual deadline. Menascé Decl. at ¶¶ 125-27.[7] The court agrees with

3    ServiceNow that the claims of this patent are directed to an abstract idea. Looking to Claim 12 of

4    the '683 patent, the court notes that the "concept embodied by the majority of the limitations,"

5    *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014), reduces to four conceptual

6    elements:[8]

   1.  Inspecting a service ticket to determine a deadline for when a problem must be
       resolved

   2.  Displaying service tickets that have reached a predetermined percentage of the time
       before their due date

   3.  Determining a deadline-approaching alert time

   4.  Alerting the user when that alert time is reached

'683 Patent at Claim 12.

    Taken together, limitations 1, 3, and 4 listed above do nothing more than describe what it

means to monitor deadlines and provide alerts regarding those deadlines. "Although certain

additional limitations, such as [limitation 2], add a degree of particularity, the concept embodied by

the majority of the limitations describes only the abstract idea of" monitoring deadlines and

providing alerts regarding those deadlines. *Ultramercial*, 772 F.3d at 715. The court thus concludes

that Claim 12 of the '683 patent is directed to the abstract idea of monitoring deadlines and

providing an alert when the deadline is approaching.

---

[7] ServiceNow objects to HP's submission of the declaration of Dr. Daniel A. Menascé on the basis that the declaration is directed to legal conclusions, which fall exclusively within the province of the court. The court agrees with ServiceNow that much of the declaration is directed to impermissible legal conclusions. However, the objection is **OVERRULED** on the basis that the court is capable of considering the declaration for its factual content while ignoring any impermissible legal conclusions. The court has reviewed Dr. Menascé's declaration and has considered his conclusions to the extent they are properly characterized as factual rather than legal. *See Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1340 (Fed. Cir. 2013) (recognizing that "[p]atent eligibility under § 101 presents an issue of law" that "may contain underlying factual issues"), cert. denied, 134 S. Ct. 2871 (2014).

[8] The court need not reach the question of whether the preamble to this claim is limiting. Even assuming it is, it merely "recite[s] a handful of generic computer components," which is insufficient to turn a claim for an abstract idea into a concrete implementation of that idea. *See Alice*, 134 S.Ct. at 2360.

Having found that this claim is directed to an abstract idea, the court must now search the claim limitations, individually and taken as an ordered combination, to determine whether the claim contains an "inventive concept" to ensure that the patentee is claiming a patent-eligible application of this idea, rather than attempting to patent the idea itself.

It is clear under Supreme Court precedent that simply reciting the phrase "instructions for" in front of the substantive functional limitations is insufficient to turn an otherwise ineligible abstract idea into a patent-eligible application. This is no different than simply adding the words "use a computer to" before reciting an abstract idea, which the Supreme Court has unanimously held to be insufficient. *See Alice*, 134 S.Ct. at 2359 ("[T]he relevant question is whether the claims here do more than simply instruct the practitioner to implement the abstract idea . . . on a generic computer. They do not.") Claiming any and all "instructions for" implementing an abstract idea is substantively identical to instructing the practitioner to implement the abstract idea on a computer.

For the same reason, adopting HP's proposed constructions does not alter the court's conclusion that the claims are directed to patent-ineligible subject matter. *See Bascom Research, LLC v. LinkedIn, Inc.*, No. 12-cv-06293, 2015 WL 149480, at *12 (N.D. Cal. Jan. 5, 2015). HP's proposed constructions of 'monitoring server,' 'database,' and 'help desk client' fail to limit claim scope to a concrete implementation or application of the abstract idea discussed above. HP construes 'monitoring server' to mean "[a] server specifically configured to," followed by a functional description of the abstract idea being claimed. HP construes 'database' to mean "[a] structured set of data specifically configured to," followed by a functional description of the abstract idea being claimed. Finally, HP construes 'help desk client' to mean "[a] client used by a help desk user specifically configured to," followed by a functional description of the abstract idea being claimed. Reciting generic computer components "configured to" implement an abstract idea is no different than adding "instructions for" in front of the abstract idea; in either case, any and all implementations of the abstract idea are being claimed, which is essentially equivalent to claiming the abstract idea itself. *See Alice*, 134 S.Ct. at 2360 (holding unpatentable "system claims recit[ing] a handful of generic computer components configured to implement the [abstract] idea" because the recited computer component limitations were "purely functional and generic").

Similarly, the fact that the claims are limited to applying this abstract concept in the context of IT help desks does not supply the necessary inventive concept. "*Flook* established that limiting an abstract idea to one field of use . . . did not make the concept patentable." *Bilski v. Kappos*, 561 U.S. 593, 612 (2010). For the same reason, the fact that the claims are limited to deadlines based on a "contractually required time for resolution of the problem," '683 Patent at Claim 12, does not transform the abstract idea of providing deadline alerts into a patentable implementation or application of that concept.

The only potential for an inventive concept is in the second limitation listed above. In addition to providing alerts regarding upcoming deadlines, the claimed invention requires displaying service tickets that have reached a predetermined percentage of the time before their due date. Taken by itself, this claim limitation certainly cannot supply an inventive concept to render the abstract idea patent-eligible. First, this limitation is in itself an abstract idea, and so is not patentable on its own. Second, the court does not understand HP to be arguing that the idea of showing service tickets that have reached a predetermined percentage of time before their due date is innovative or non-conventional. The court also considers the limitations as an ordered combination and finds that considering them as such adds nothing to what is present when the limitations are considered separately. *See Alice*, 134 S.Ct. at 2359.

Because the claims of the '683 patent do nothing more than recite the abstract idea of monitoring deadlines and alerting users about upcoming deadlines, along with an instruction to implement the idea on various computing components, the claims of the '683 patent are not directed to patentable subject matter. Accordingly, the court grants ServiceNow's motion for summary judgment as to the invalidity of the asserted claims of the '683 patent.

### B.    U.S. PATENT 6,321,229

The '229 patent is directed to an apparatus and method "for accessing an information repository." '229 Patent at Claim 8. Specifically, it is directed toward allowing hierarchical access to the information based on categories of information stored in the repository. *See* '229 Patent at Claim 8(b)(i), 8(b)(i)(2); *see also* Menascé Decl. at ¶¶ 47, 82. ServiceNow contends that the '229 patent attempts to claim the abstract idea of categorizing and organizing information into a

United States District Court
Northern District of California

hierarchy. Opening Brief at 16, ECF 70. If this characterization of the claims at issue is correct, there is little doubt that the claims are invalid as being directed to patent-ineligible subject matter. Claiming the abstract idea of organizing information into a hierarchy would preempt any other inventor from creating a computer-based method for categorizing and organizing information by classification, no matter how the inventor achieved this result. *See, e.g., Cyberfone Sys v. CNN Interactive Grp*, 558 F. App'x 988, 992 (Fed. Cir. 2014); *Digitech Image Technologies v. Electronics for Imaging*, 758 F.3d 1344, 1351 (Fed. Cir. 2014).

HP does not dispute that such abstract ideas are patent-ineligible, but rather disputes ServiceNow's characterization of the '229 patent's claims. According to HP, the '229 patent claims something much more specific and concrete than ServiceNow suggests. Opposition Brief at 14, ECF 79 ("The '229 Patent is directed to an apparatus and method that uses specialized data structures . . . ."). Specifically, HP points to the fact that its claims are limited to implementations that use "derived containers" and "container definition nodes." Opposition Brief at 15.

If HP is correct that "derived containers" and "container definition nodes" really are specific, specialized data structures, rather than functionally defined generic computer components, then the '229 patent's claims are distinguishable from those at issue in *Cyberfone* and *Digitech* and may be patent-eligible. However, ServiceNow disputes HP's characterization of the claimed data structures as "specialized." ServiceNow argues that the claims of the '229 patent simply use idiosyncratic names to identify what are actually "generic computer structures." ServiceNow's Supplemental Brief at 5, ECF 91; *see also Alice*, 134 S.Ct. at 2360 (holding unpatentable "system claims recit[ing] a handful of generic computer components configured to implement the [abstract] idea" because the recited computer component limitations were "purely functional and generic").

The court concludes, as an initial matter, that the patentability of the invention claimed by the '229 patent turns on whether "container definition nodes" and "derived containers" are idiosyncratic names for generic computer data structures. If they are indeed generic computer data structures, the meaningful limitations of Claim 8 are merely:

1. Creating a hierarchy of data structures, with each data structure corresponding to:

   a. a definition for that data structure; and

b.   a category of information stored in the repository

2.   Displaying one or more of these data structures (i.e. categories of information)

3.   Displaying the content of one of these data structures upon selection by the user (i.e. displaying the corresponding category of information)

Thus, if ServiceNow is correct and "derived containers" and "container definition nodes" are merely generic computer components, Claim 8 of the patent recites nothing more than organizing the information in a repository into a hierarchy and allowing the user to access it that way. Undoubtedly, this would be an unpatentable abstract idea. Accordingly, the court turns to HP's constructions of "derived container" and "container definition node" to ascertain if they are truly specialized data structures, and not merely "functional" descriptions of "generic computer components configured to implement the same idea." *See Alice*, 134 S.Ct. at 2360.

HP proposes to construe "container definition node" to mean a "[d]ata structure having one or more attributes for accessing an information repository and related to creating a hierarchy of information." Clearly, unspecified data structures are generic computing components unless defined by further details. The question then is whether HP's proposed construction amounts to more than a "functional and generic" description of the data structure. The court concludes that HP's proposed construction does not go beyond the kind of "functional and generic" description of "generic computer components configured to implement the [abstract] idea" that the Supreme Court rejected in *Alice*. Any computer-based "[a]pparatus for accessing information in an information repository," '229 Patent at Claim 8, will require data structures containing information for accessing the information repository. This is merely a functional description of what the otherwise generic data structure needs to accomplish. Similarly, any apparatus for organizing information hierarchically will require data structures "related to creating a hierarchy of information." This is again nothing more than a functional description of the data structure, rather than a substantive limitation on how the abstract idea is implemented.

HP's proposed construction of "derived container" as a "[d]ata structure capable of executing a query based on an attribute from one or more corresponding container definition nodes"— though phrased in technical terms—is similarly functional and generic. The fact that the data

United States District Court
Northern District of California

structure is capable of executing a query is simply another way of saying that the data structure is capable of accessing the information repository; it says nothing of *how* the data structure is capable of performing these operations. The limitation would cover any implementation of a data structure that achieves this functionality. The generic and functional nature of the data structure's ability to execute a query is further shown by the fact that it is executing the query "based on an attribute from one or more corresponding container definition nodes." As explained above, the container definition nodes' attributes are nothing more than unspecified information for accessing the information repository. The derived containers' ability to execute queries based on these attributes merely states that derived containers are able to use the information for its intended purpose.

In short, taken together, the container definition nodes and derived containers are nothing more than a data structure containing information for accessing the information repository hierarchically and a data structure for using that information. This describes every conceivable implementation of the abstract idea. Accordingly, the court concludes that the claims of the '229 patent are drawn toward an abstract idea.

Having found that this claim is directed to an abstract idea, the court must now search the claim limitations for an "inventive concept" to ensure that the patentee is claiming a patent-eligible application of this idea, rather than attempting to patent the idea itself. The only limitation in the claim beyond what was determined above to be a purely abstract idea is the requirement of "a number of computer readable media." '229 Patent at Claim 8. This limitation clearly does not supply any inventive concept, but rather merely limits the abstract idea to the context of computers. Similarly, there is no inventive concept in combining computer readable media with the idea of categorizing and organizing information hierarchically. Accordingly, the court finds the asserted claims of the '229 patent to be invalid under § 101 for failing to claim patentable subject matter.

## C.   U.S. Patents 7,890,802 and 7,610,512

The '802 and '512 patents share a specification and are directed to automating the resolution of IT incidents. The '802 patent is directed to a "computer implemented method for facilitating a user in defining a repair workflow for subsequent use in resolving information technology (IT)

United States District Court
Northern District of California

incidents." '802 Patent at Claim 1. The '512 patent is directed toward a "computer implemented method for resolving an information technology (IT) incident," '512 Patent at Claim 1, using a repair workflow as created in the '802 patent. HP's expert describes the '512 and '802 patents as teaching "a technological innovation that reduces the average time to resolve an IT incident," Menascé Decl. at ¶ 45, and as addressing "the problem of how to manage and resolve 'Information Technology (IT)' incidents using a computer," *id.* at ¶ 57. "The '512 and '802 Patents disclose a computer implementation for automating IT incident repair." *Id.* at ¶ 60.

Looking to Claim 1 of the '802 patent as representative, the court notes the following substantive limitations:

1. Defining the steps of the repair workflow, with each step having inputs and outputs

2. Using the output of a step to determine what step to take next

3. Making sure the repair workflow is correct, including making sure that there are no "dead ends" in the workflow[9]

Looking to Claim 1 of the '512 patent as representative, the court notes the following substantive limitations:

1. Loading a repair workflow

2. Creating a repair frame and initializing its repair context

3. Supplying inputs to a step in the repair workflow based on the repair context

4. Executing the step

5. Extracting the output of the step

6. Choosing the next step based on the output

These limitations, at face, describe the idea of automating IT incident resolution. "Although certain additional limitations . . . add a degree of particularity, the concept embodied by the majority of the limitations describes only the abstract idea of" defining and executing automated workflows to resolve IT incidents. *Ultramercial*, 772 F.3d at 715. Of course, the claims are not stated so simply. As HP notes, the claim limitations are stated in terms of 'repair workflows,'

---

[9] Making sure there are no "dead ends" means "verifying that each response of each step's operation has a transition to another step." '802 Patent at Claim 1.

'operations,' 'steps,' 'responses,' 'transitions,' 'bindings,' 'repair contexts,' and 'repair frames.' If these claim terms were precise and narrow, they might well be enough to change the nature of the claimed invention from an abstract idea into a concrete implementation, since any automated system for resolving IT incidents that managed to avoid meeting even one of these limitations would still remain open to the public. But HP's proposed constructions of these terms do nothing to make the claims any narrower than stated above.

As made clear by HP's constructions, these terms are not narrowly and specifically defined data structures as HP contends, but rather functional and generic recitations of general computing concepts. A 'repair workflow' is merely "a set of instructions used by the system to resolve incidents." Each repair workflow consists of 'steps,' which perform 'operations': "unit[s] of work to be performed," containing inputs, results, and responses. The response is used to define the 'transition' to the next step. The inputs to operations are supplied by 'bindings,' which are defined functionally by the fact that they "define[] a mapping of data values to the inputs of an operation." The 'repair context' and 'repair frame' are generically defined data structures that allow data to be stored for later access, with no further details limiting their scope.

These terms are merely recitations of what it means to automate something on a computer, which necessarily requires everything to be defined in terms of discrete operations communicating with each other via inputs and outputs. In short, even after taking HP's proposed constructions into account, the '802 and '512 patents' claims are so broadly worded as to cover *any* attempt to automate the resolution of IT incidents with a computer. But the automation of IT incident resolution is an abstract idea, not patentable under § 101.

Having determined that the '802 and '512 patents' claims are drawn to an ineligible abstract idea, the court must consider the claim limitations, individually and taken as an ordered combination, to determine whether the claims contain an "inventive concept" sufficient to ensure that the patentee is claiming a patent-eligible application of the idea, rather than attempting to patent the idea itself. The court concludes that they do not.

Looking first at Claim 1 of the '802 patent, the only limitation that is not a recitation of the idea of automating IT incident resolution is the third limitation listed above ("Making sure the

United States District Court
Northern District of California

repair workflow is correct, including making sure that there are no 'dead ends' in the workflow"). This limitation does not specify how the verification of the workflow's correctness is to be achieved; it merely instructs that the workflow be verified. HP has given the court no reason to suspect that this involves anything other than the routine application of conventional computing concepts, and therefore it cannot supply the necessary "inventive concept" to direct the claim to patent-eligible subject matter. This is true whether the claim limitations are considered individually or as an ordered combination. Accordingly, the court concludes that the asserted claims of the '802 patent are invalid as directed to patent-ineligible subject matter.

Looking next at Claim 1 of the '512 patent, there are no additional limitations beyond reciting the execution of an automated workflow to resolve IT incidents. Because all of the limitations are directed to the abstract idea of automated IT incident resolution, the claims—whether considered individually or as an ordered combination—contain no additional "inventive concept" to render the claim's subject matter patent-eligible. Accordingly, the court concludes that the asserted claims of the '512 patent are invalid as directed to patent-ineligible subject matter.

To support the validity of the patents' claims, HP points to the fact that "[t]he invention has also been a success in the industry, thereby demonstrating that the claims represent an improvement over conventional practice." Opposition Brief at 12, ECF 79. This argument misses the point, directing itself to novelty and obviousness rather than the patentability of the subject matter. *See Diamond v. Diehr*, 450 U.S. 175, 189-91 (1981) (distinguishing patent-eligibility under § 101 from novelty and obviousness under §§ 102, 103). For example, a self-driving car might be very successful commercially. It might be novel and—its implementation, at least—non-obvious. But that doesn't make the concept of a self-driving car any less abstract. The first inventor to successfully create a self-driving car might be able to patent his specific implementation of the idea with appropriately narrow claim language, limited to the inventor's particular implementation. But the inventor could *not* patent self-driving cars in the abstract, no matter how novel or successful his particular self-driving car might be.

Thus, even accepting that HP was the first entity to successfully automate the resolution of IT incidents, this does not entitle HP to a patent on (the abstract idea of) the automated resolution of

IT incidents. The '802 and '512 patents' specification may contain somewhere a specific, patentable implementation of automating the resolution of IT incidents. But for purposes of § 101, the claims themselves are what matter, and what is claimed is far too broad to constitute a specific implementation of automated resolution of IT incidents. Rather, the claims generically claim any computer-implemented automation of resolving IT incidents. This is an abstract idea and thus is not patentable.

This conclusion is buttressed by concerns of preemption. Granting HP a monopoly on a very specific implementation of computer-automated resolution of IT incidents would spur innovation, by creating an incentive for others to develop a different implementation in order to avoid HP's patent. But the claims in the '802 and '512 patents would have the opposite effect. They are framed in such broad, functional language as to cover any conceivable computer-automated system for resolving IT incidents. By broadly preempting any computer-automated system for the resolution of IT incidents, these patent claims would inhibit innovation, because there is no incentive to develop new systems of computer-automated resolution of IT incidents—any new system that gets developed would incur not only the cost of development, but also the cost of licensing HP's invention.

## IV.  ORDER

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

ServiceNow's motion for summary judgment of invalidity on the asserted claims of U.S. Patents 8,224,683; 6,321,229; 7,890,802; and 7,610,512 is **GRANTED**.

Dated: March 10, 2015

BETH LABSON FREEMAN
United States District Judge

# APPENDIX A

## PATENT CLAIMS AT ISSUE

### U.S. PATENT 8,224,683

#### CLAIM 12

A computer program product in a non-transitory computer readable media for use in a data processing system for monitoring service tickets for information technology service providers to ensure that levels of service required to be provided to a customer pursuant to a contractual agreement between the customer and a service provider, are met, the computer program product comprising:

   first instructions for inspecting a service ticket in a database to determine a deadline for when a problem associated with the service ticket must be resolved, with the deadline based upon a contractually determined severity of the problem and a corresponding contractually required time for resolution of the problem;

   display instructions for displaying, on a display device at the help desk, a graphical display populated with representations of service tickets that have reached a predetermined percentage of the time before their due date;

   second instructions for determining an deadline approaching alert time at which a help desk user must be notified that the deadline for resolving the problem must be met; and

   third instructions for alerting the help desk user that the deadline for resolving the problem is approaching when the deadline approaching alert time is reached.

#### CLAIM 32

A system for monitoring service tickets in order to provide reminders to a help desk user of impending times for actions, the times for actions being provided according to a level of service required to be provided to a customer pursuant to a contract between the customer and a service provider, the system comprising:

   a monitoring server;

   a database; and

   a help desk client;

   wherein the database stores tickets and information regarding ticket types, ticket severities based on the contract, and corresponding contractually required times for actions to be performed for each of the ticket types and ticket severities; the monitoring server monitors tickets in the database, determines when times for actions are approaching, and sends alerts to the help desk client alerting the help desk user that a time to take a specified action is approaching; and the help desk client displays active tickets to a help desk user and provides alerts received from the monitoring server to the help desk user.

## CLAIM 35

The system as recited in claim 32, wherein the active tickets displayed are only those that have reached a predetermined percentage of the time before their due date.

## U.S. PATENT 6,321,229

## CLAIM 8

Apparatus for accessing an information repository, comprising:
    a. a number of computer readable media; and
    b. computer readable program code stored on said number of computer readable media, said computer readable program code comprising:
        i. code for creating a hierarchy of derived containers, wherein a given derived container corresponds to:
            (1) a container definition node of an information model, said information model comprising a hierarchy of container definition nodes; and
            (2) a category of information stored in said information repository;
        ii. code for displaying given ones of said derived containers to a computer user; and
        iii. code for determining if a given one of said displayed derived containers has been selected by a computer user, and upon selection of said given one of said displayed derived containers, displaying contents of said given one of said displayed derived containers.

## CLAIM 9

Apparatus as in claim 8, wherein the contents of some derived containers comprise child derived containers, and the contents of other derived containers comprise information extracted from said information repository.

## CLAIM 10

Apparatus as in claim 8, wherein the contents of some derived containers comprise both child derived containers and information extracted from said information repository.

## CLAIM 13

Apparatus as in claim **8**, wherein:
    a. various ones of the container definition nodes forming said information model comprise pointers which establish a hierarchical relationship between said container definition nodes of said information model; and
    b. said code for creating a hierarchy of derived containers determines the hierarchical relationship of said derived containers by referring to said information model.

## CLAIM 15

Apparatus as in claim 8, wherein each of said derived containers inherits at least one attribute from its corresponding container definition node, said at

least one attribute comprising a selection criteria attribute which determines the category of information stored in said information repository to which a derived container corresponds.

## CLAIM 17

Apparatus for accessing an information repository, comprising:
    a. a number of computer readable media; and
    b. computer readable program code stored on said number of computer readable media, said computer readable program code comprising code for creating a hierarchy of derived containers, wherein a given derived container corresponds to:
        i. a container definition node of an information model, said information model comprising a hierarchy of container definition nodes; and
        ii. a category of information stored in said information repository; wherein:
            (1) said hierarchy of container definition nodes comprises at least a first-level container definition node, a plurality of lower level container definition nodes, and a plurality of leaf nodes;
            (2) various of said container definition nodes comprise pointers to other container definition nodes to thereby establish said hierarchy of container definition nodes; and
            (3) each of said container definition nodes comprises a selection criteria attribute.

## CLAIM 18

A computer based method of accessing an information repository, comprising:
    a. said computer creating a hierarchy of derived containers, wherein a given derived container corresponds to:
        i. a container definition node of an information model, said information model comprising a hierarchy of container definition nodes; and
        ii. a category of information stored in said information repository;
    b. said computer displaying given ones of said derived containers to a computer user; and
    c. said computer determining if a given one of said displayed derived containers has been selected by a computer user, and upon selection of said given one of said displayed derived containers, displaying contents of said given one of said displayed derived containers.

## CLAIM 19

A method as in claim 18, wherein the contents of some derived containers comprise child derived containers, and the contents of other derived containers comprise information extracted from said information repository.

## CLAIM 20

A method as in claim 18, wherein the contents of some derived containers comprise both child derived containers and information extracted from said information repository.

**U.S. PATENT 7,890,802**

**CLAIM 1**

A computer implemented method for facilitating a user in defining a repair workflow for subsequent use in resolving information technology (IT) incidents, comprising:

    facilitating the user in defining a plurality of steps of the repair workflow using a computing device, wherein facilitating the user in defining a plurality of steps comprises facilitating the user in defining a plurality of operations for the steps, and defining inputs and outputs of the operations;

    facilitating the user in defining a plurality of transitions between the steps, based at least in part on the outputs of the steps, using a computing device; and

    checking the defined repair workflow for correctness before being used to resolve an IT incident using a computing device, wherein checking the defined repair workflow for correctness includes verifying that each response of each step's operation has a transition to another step.

**CLAIM 2**

The method of claim 1, wherein said defining of a plurality of operations comprises attaching to the steps, a plurality of sets of executable code implementing the operations defined by the user.

**CLAIM 3**

The method of claim 1, wherein said facilitating of the user in defining a plurality of transitions between the steps comprises attaching to the transitions, a plurality of sets of parsing code for processing the outputs.

**CLAIM 5**

The method of claim 1, wherein said facilitating of the user in defining a plurality of transitions between the steps comprises attaching to the steps, a plurality of sets of executable code for processing the outputs.

**CLAIM 15**

An article of manufacture comprising:

    a storage medium; and

    a plurality of programming instructions stored in the storage medium, and adapted to program an apparatus to enable the apparatus to:

        facilitate a user in defining a plurality of steps of a repair workflow using a computing device, wherein the repair workflow defines a plurality of operations for the steps, and inputs and outputs of the operations; and

        facilitate the user in defining a plurality of transitions between the steps, based at least in part on the outputs of the steps, using a computing device; and

        check the defined repair workflow for correctness before being used to resolve an IT incident using a computing device, wherein said check for correctness includes a verification that

United States District Court
Northern District of California

each response of each step's operation has a transition to another step.

## U.S. PATENT 7,610,512

### CLAIM 1

A computer implemented method for resolving an information technology (IT) incident, comprising:

    loading a repair workflow having a plurality of steps and transitions between the steps, defined to repair the IT incident on a computing device, each of the steps having one or more inputs, processing logic for the input(s) and one or more outputs;

    creating a repair frame for the loaded repair workflow on the computing device;

    creating a repair context for the repair frame on the computing device, and populating the repair frame with configuration data;

    binding one or more data values to the one or more inputs of one of the steps within the repair context;

    processing the bound data values of the one or more inputs of the step within the repair context;

    executing the step's operation;

    extracting the one or more outputs of step within the context; and

    selecting a transition to transition to another step within the context, based at least in part on the extracted one or more outputs.

### CLAIM 3

The method of claim 2,[10] further comprising receiving from a requestor a request to resolve an IT incident, determining whether the user has requestor has requisite authority to make the request, and rejecting the request if the requestor is determined not to have the requisite authority to make the request.

### CLAIM 4

The method of claim 1, further comprising moving the step to the selected transition's destination, determining whether the selected transition's destination is a return step, and if so, select a response of the return step as a response of the repair workflow.

### CLAIM 5

The method of claim 4, further comprising storing a record of the processing of the step in a repair history log.

### CLAIM 7

An apparatus comprising:

    a storage medium having a plurality of programming instructions stored in the storage medium, and adapted to enable the apparatus to perform a method; and

---

[10] Claim 2 claims: The method of claim 1, further comprising creating a repair run for said loading of the repair workflow.

United States District Court
Northern District of California

one or more processors coupled to the storage medium to execute the programming instructions;

wherein the method comprises:

loading a repair workflow having a plurality of steps and transitions between the steps, defined to repair the IT incident on a computing device, each of the steps having one or more inputs, processing logic for the input(s) and one or more outputs;

creating a repair frame for the loaded repair workflow on the computing device;

creating a repair context for the repair frame on the computing device, and populating the repair frame with configuration data;

binding one or more data values to the one or more inputs of one of the steps within the repair context;

processing the bound data values of the one or more inputs of the step within the repair context;

executing the step's operation;

extracting the one or more outputs of step within the context; and

selecting a transition to transition to another step within the context, based at least in part on the extracted one or more outputs.

# Appendix B

## HP's Proposed Constructions

### U.S. PATENT 8,224,683

| Term | HP's Proposed Construction |
|---|---|
| monitoring server | A server specifically configured to monitor tickets in the database, determine when times for actions are approaching, and send alerts to the help desk client alerting the help desk user that a time to take a specified action is approaching |
| database | A structured set of data specifically configured to store tickets and information regarding ticket types, ticket severities based on the contract, and corresponding contractually required times for actions to be performed for each of the ticket types and ticket severities |
| help desk client | A client used by a help desk user specifically configured to display active tickets to the help desk user and provide alerts received from the monitoring server to the help desk user |

### U.S. PATENT 6,321,229

| Term | HP's Proposed Construction |
|---|---|
| container definition node | Data structure having one or more attributes for accessing an information repository and related to creating a hierarchy of information |
| derived container | Data structure capable of executing a query based on an attribute from one or more corresponding container definition nodes |

### U.S. PATENT 7,890,802

| Term | HP's Proposed Construction |
|---|---|
| repair workflow | A repair workflow is a set of instructions used by the system to resolve incidents. The repair workflow is constructed from steps, operations, and transitions. |
| operation | An operation is a unit of work to be performed in context of a repair workflow. Operations contain inputs, results, and responses.<br>• Inputs define the necessary information required to perform a task.<br>• Results are the information produced by executing the task.<br>• Responses define a finite set of possible outcomes from the execution of the operation.<br>Steps and transitions use responses to link operations together in a repair workflow. |
| step | A step is an invocation of an operation in the context of a repair workflow. The step has a reference to the operation that it invokes. The step defines how the inputs of the operation are supplied data values at the time of repair matching of each input with a binding. |
| response | A response defines a finite set of possible outcomes from the execution of the operation. Steps and transitions use responses to link |

United States District Court
Northern District of California

United States District Court
Northern District of California

| | operations together in a repair workflow. |

## U.S. PATENT 7,610,512

| Term | HP's Proposed Construction |
|------|----------------------------|
| repair workflow | A repair workflow is a set of instructions used by the system to resolve incidents. The repair workflow is constructed from steps, operations, and transitions. |
| operation | An operation is a unit of work to be performed in context of a repair workflow. Operations contain inputs, results, and responses.<br>• Inputs define the necessary information required to perform a task.<br>• Results are the information produced by executing the task.<br>• Responses define a finite set of possible outcomes from the execution of the operation.<br>Steps and transitions use responses to link operations together in a repair workflow. |
| step | A step is an invocation of an operation in the context of a repair workflow. The step has a reference to the operation that it invokes. The step defines how the inputs of the operation are supplied data values at the time of repair matching of each input with a binding. |
| transition | A transition links various steps together. The transition has a source step and a destination step and a link to an operation response called the 'transition trigger.' A step has only one transition for each response that is defined by its operation. After a step executes its operation at repair time, the response is used to select the transition to go to the next step. |
| binding | A binding defines a mapping of data values to the inputs of an operation in the context of a step within a repair workflow. Various types of bindings exist, with each having a unique method of supplying values to operation inputs. |
| repair run | An execution of a repair workflow. |
| repair context | A set of key–value pairs containing data values discovered during a repair run can be pushed into a repair context. The subsequent steps of the repair run use the data values stored in the repair context. |
| repair frame | A frame of execution in a repair is referred to as a repair frame. Each repair workflow is assigned a repair frame during execution. A frame stack is created during repair execution. Repairs [that] contain subflows will have a frame for each subflow. During execution, the flow of control will 'step into' and 'step out' of frames as repair steps are executed. |